**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | * |
| **v.** | * |
| **DEMAR A. BROWN,** | *   **Case No.: GJH-18-0335** |
| **JASHON C. FIELDS, and** | |
| **KAMAR O. BECKLES,** | * |
| **Defendants.** | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**MEMORANDUM OPINION**

The Government has charged Defendants Demar A. Brown, Jashon C. Fields, and Kamar

O. Beckles with one count of Conspiracy, in violation of 18 U.S.C. § 371, and have charged

Defendants Brown and Beckles with three counts of Interstate Transportation of Stolen Property,

in violation of 18 U.S.C. § 2314. ECF No. 88. Presently pending before the Court are

Defendants' Motions to Suppress Evidence, ECF Nos. 77, 92, 110; Motions to Suppress

Statements, ECF Nos. 76, 91, 109; Motion to Sever, ECF No. 78; Motion for Leave to Adopt

Motions filed by Co-Defendants, ECF No. 103; Motions for Disclosure of Rule 404(b) Evidence,

ECF Nos. 80, 93, 105/106; Motions for Disclosure of Experts, ECF No. 81; Motion for

Disclosure of Co-Defendants' Statements, ECF No. 107; Motion for Disclosure Pursuant to Rule

12, ECF No. 108; and Motion to Require Prosecution to Review and Confirm Witness, ECF No.

111. The motions have been fully briefed, and an evidentiary hearing was held on November 18,

2019. ECF No. 125. For the reasons explained below, Defendants' motions to suppress are

denied, while certain discovery related motions are granted in part and denied in part.

## I.      BACKGROUND

On January 26, 2018, Defendants were arrested in connection with several residential burglaries. ECF No. 135 at 89–90.[1] On June 19, 2018, a Grand Jury in the District of Maryland returned a four-count Indictment charging all four Defendants with Conspiracy and three counts of Interstate Transportation of Stolen Property. ECF No. 1. Defendants were arraigned on these charges and entered pleas of not guilty. ECF Nos. 11, 27, 43. A Superseding Indictment, which included additional overt acts and limited the charges against Defendant Fields to Count I only, was filed on June 11, 2019. ECF No. 88.

Defendants filed various motions to suppress, motions for disclosure and other motions, ECF Nos. 76, 77, 78, 80, 81, 82, 91, 92, 93, 103, 104, 105, 107, 108, 109, 110, 110, which the Government opposed, ECF No. 118. An evidentiary hearing was held on November 18, 2019. ECF No. 125. At that hearing, the Government presented three witnesses: Joshua Harding, an officer with the Baltimore County Police Department's Community Action Team who was involved in the detainments and arrests of Defendants, *see* ECF 135 at 4; Roger Caple, a detective for the Baltimore County Police Department's Investigations Unit who was involved in the detainments and arrests of Defendants Fields and Beckles, *see id.* at 68–70; and Carl Walder, a detective for the Baltimore County Police Department's CIB Burglary Unit who was involved in the arrests and interviews of the Defendants, *see id.* at 88–89. The Court found the witnesses to be credible and finds the facts to be consistent with the testimony summarized below and in the discussion that follows.

---

[1] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

From late 2017 through January 26, 2018, a series of residential burglaries were committed targeting residences around the Cockeysville and the "Townson, Ruxton" areas of Baltimore County, Maryland. ECF No. 135 at 6, 9, 71. Witnesses and surveillance cameras in the area of several of the burglaries observed a dark-colored SUV, suspected to be a Ford Explorer, leaving the area. ECF No. 135 at 8, 64–65, 71–72. Surveillance video at several of the crime scenes also showed two to three African-American males wearing dark-colored clothing, including one who appeared to be wearing black combat boots. ECF No. 135 at 6–8, 40, 86. During one of the burglaries on December 18, 2017, a housekeeper startled three burglars who had broken into her employer's home, and she believed one of the burglars had a handgun. *Id.* at 7, 70–71, 84. Witnesses also informed detectives that the suspects were using "walkie-talkie" style two-way radios. *Id.* at 7, 29.

On January 26, 2018, Officer Joshua Harding was in the "Jenifer Road, Timonium Road area" on a detail related to the residential burglaries. ECF No. 135 at 8. He was in plain clothes and in an unmarked vehicle. *Id.* Officer Harding testified that he received a call regarding a burglary in which a safe had been taken from 14101 Blenheim Road in Phoenix, Maryland, outside the area of the prior burglaries but fitting the pattern—large houses and yards. *Id.* at 9–10, 12. He rushed to the location, and when he turned onto Blenheim Road, he saw a dark green Ford Explorer with a North Carolina license plate driving about 10 miles per hour. *Id.* at 15–17. Officer Harding followed the vehicle until it parked in a driveway at 3 Blenmont Court. *Id.* at 18–20. When he turned on his indicator light, as if he was going to turn into the driveway, the vehicle backed out, pulled alongside him, and the drivers were able to see each other. *Id.* at 20–21. The driver of the Ford Explorer, who was wearing a dark colored coat or sweatshirt, threw up his hands and drove away. *Id.* at 21. Although Officer Harding was in plain clothes, he still had a

police badge on his chest, and assumed the driver had been able to tell that he was a police officer. *Id.*; *see also id.* at 45. Officer Harding continued following the vehicle and saw it pull into a second driveway. *Id.* at 22–24. He attempted to drive through the yard to block the vehicle in the driveway, but the driver backed out, made a U-turn, and again started driving toward Blenheim Road. *Id.* at 24. By this time, an aviation unit was tracking the Ford Explorer and directed Officer Harding to a third driveway where the vehicle had parked, located at 3805 Blenheim Road. *Id.* at 24–25. Officer Harding pulled in to block the vehicle from leaving. *Id.* at 25–26. The driver got out of the car and raised his hands, and Officer Harding drew his firearm and yelled, "Police—get on the ground." *Id.* at 26. The driver ran away behind the house but was soon apprehended and cuffed by Officer Harding and another police officer. *Id.* at 26–29. Officer Harding saw the driver had a two-way radio and a phone in his hands. *Id.* at 29. Officer Harding also saw a safe and a hand truck in the back seat of the vehicle he had been driving. *Id.* at 30. The driver was searched and subsequently arrested. *Id.* at 31–32, 89. He was identified as Demar A. Brown. *Id.* at 31–32.

After Defendant Brown was arrested, the police established a perimeter around the area, as they suspected he was working with others who were on foot based on how Defendant Brown had been circling the neighborhood and the knowledge that the burglars were working in teams. *Id.* at 33–34, 73–74. Investigators also determined that the residence located at 3 Blenmont Court, the first driveway that Defendant Brown had entered, had been burglarized. *Id.* at 21. When another officer saw an individual enter a wooded area near Sweet Air Road, Officer Harding directed the investigators to a church parking lot where he expected the individual to emerge. *Id.* at 34–36. When the officers arrived, they shone their headlights into the woods, and one officer eventually saw an individual come out of the woods, later identified as Jashon C.

4

Fields. *Id.* at 36–37, 39, 76–77. The officers ordered him to the ground. *Id.* at 39. Defendant Fields told the officers unprompted that he had been in the area to meet a prostitute. *Id.* at 77–79. Officer Harding testified that he then saw a second individual lying on the ground nearby, later identified as Kamar O. Beckles. *Id.* at 39–40. Both individuals were cuffed and searched. *Id.* at 40–41, 78–80. Defendant Fields was found to have $1,000 in a sock, and both Defendants Fields and Beckles had hotel key cards matching one found on Defendant Brown. *Id.* at 80, 92.

All three individuals were taken to Baltimore County Police Headquarters, *id.* at 32, 80, 90, informed of their *Miranda* rights and interviewed. *Id.* at 93–94, 97, 103–04. Defendant Brown provided investigators with a current address, among other biographical information, when completing his written *Miranda* waiver. *Id.* at 94. He then invoked his right to remain silent and questioning was terminated. *Id.* at 96–97. Defendant Fields waived his *Miranda* rights and admitted to having travelled in the seized Ford Explorer to an unknown area in Baltimore County on the night of January 26, 2018, and to being involved in at least one of the incidents, but he said he fled when he became aware of what Defendant Beckles was doing. *Id.* at 97–98, 100–03. Defendant Beckles also waived his *Miranda* rights, and he admitted that he was in debt, travelled in the seized Ford Explorer with Defendants Brown and Fields, and used his feet to break the door to gain entry to at least one of the houses on January 26, 2018. *Id.* at 104–10.

Early in the morning of January 27, 2018, Baltimore County Police obtained warrants to search the Ford Explorer and the hotel rooms used by Defendants, which were identified using the key cards found in their possession. *Id.* at 90–93; *see also* ECF Nos. 120-4, 120-5, 120-6. Investigators also obtained warrants for DNA samples from Defendants; the mobile devices seized from Defendants; North Carolina residences identified by Defendants; and several Google, social media, and other electronic accounts. *See* ECF No. 135 at 90–92; *see also* ECF

Nos. 120-7, 120-8, 120-9, 120-10, 120-11, 120-12, 120-13, 120-14, 120-15, 120-16. Finally,

Baltimore County Police obtained court orders to obtain historical cell site location information

for eleven different electronic devices. *See* ECF Nos. 120-17, 120-18, 120-19, 120-20, 120-21,

120-22, 120-23, 120-24, 120-25, 120-26, 120-27.

## II.    DISCUSSION

As indicated previously, there are a number of motions that remain pending. The Court

will first address a number of preliminary matters before turning to the discovery-related motions

and then the motions to suppress.

### A.  Preliminary Matters

Defendant Brown moved to adopt all motions of other defendants, and specifically

moved to adopt Defendant Fields' Motion to Sever, ECF No. 78. ECF No. 103. As stated at the

evidentiary hearing, any motions to adopt the motions of other defendants will be granted. ECF

No. 135 at 116.

Defendants Brown and Fields also moved for leave to file additional motions. ECF Nos.

82, 104. All currently pending motions will be addressed. Any additional motions should be filed

consistent with the current pre-trial schedule in this case or be accompanied by a motion for

leave to file.

Finally, Defendants moved to sever themselves from their co-defendants, arguing there is

a serious risk that joinder will compromise their trial rights and the jury's ability to determine

their guilt or innocence. ECF No. 78 at 1. Joinder is clearly appropriate in this case given that

Defendants were arrested as part of a common scheme. *United States v. Akinkoye,* 185 F.3d 192,

197 (4th Cir. 1999) ("Generally, we adhere to the rule that defendants charged with participation

in the same conspiracy are to be tried jointly."). Defendants express concern about prejudice

stemming from the Government's potential reliance on confessions made by certain defendants that directly implicate others. ECF No. 78 at 1–2; *see also* ECF No. 135 at 126–27. However, the Government stated at the evidentiary hearing that it plans to use redacted versions of the statements in order to resolve any concerns in this regard and that it would provide Defendants with copies of the proposed redactions. ECF No. 135 at 151–52. The Court will therefore deny this motion without prejudice and allow the parties to determine whether these redactions resolve the dispute.

### B.  Discovery Motions

Defendants move for disclosure of Rule 404(b) evidence, ECF Nos. 80, 93, 105/106, and Rule 16(a)(1)(G) experts, ECF No. 81.[2] Defendants also move for disclosure of co-defendants' statements and for the Government to declare the basis for their potential admission, ECF No. 107, for disclosure of Rule 12 evidence, ECF No. 108, and to require the Government to review and confirm witness backgrounds, ECF No. 111. The Court will consider each request in turn.

Rule 404(b) of the Federal Rules of Evidence states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith," but may be admissible for other purposes. Rule 404(b)(2) requires the Government, "[o]n request by a defendant in a criminal case" to:

> (A) provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial; and
> (B) do so before trial — or during trial if the court, for good cause, excuses lack of pretrial notice.

Defendants requested that this information be provided by February 1, 2020, ECF No. 135 at 117, 135, and the Government agreed this date was reasonable, *id.* at 141–42. As trial was

---

[2] Unless otherwise stated, the Court treats the motions as adopted by all three co-defendants.

originally scheduled to begin April 13, 2020, but has since been rescheduled to February 1, 2021, the Court determines that Rule 404(b) evidence must be disclosed by December 1, 2020.

Federal Rule of Criminal Procedure 16(a)(1)(G) provides, "[a]t the defendant's request, the government must give to the defendant a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial." Defendants requested that the Rule 16 expert information be disclosed by January 1, 2020. *See* ECF No. 135 at 158–59. The Court therefore finds the expert information must be disclosed by December 1, 2020, in light of the new trial date.

Defendant Brown requests the disclosure of statements of any co-defendant or co-conspirator that the prosecution intends to offer against Mr. Brown or any co-defendant under Federal Rule of Evidence 801(d)(2)(E), which permits the government to introduce the statements of a co-conspirator made during and in furtherance of the conspiracy. ECF No. 107 at 1. The Government has indicated that statements made by co-conspirators have been produced to the defense. ECF No. 118 at 23–24. To the extent Defendants also request that the Government identify the evidentiary basis upon which it will seek admission, that request is denied.

Defendant also moves to compel the Government to disclose its intent to use any evidence that could be subject to a motion to suppress. Federal Rule of Criminal Procedure 12(b)(4)(B) states:

> At the arraignment or as soon afterward as practicable, the defendant may, in order to have an opportunity to move to suppress evidence under Rule 12(b)(3)(C), request notice of the government's intent to use (in its evidence-in-chief at trial) any evidence that the defendant may be entitled to discover under Rule 16.

The Advisory Committee's Note accompanying the Rule makes clear that, consistent with its text, the Rule's core purpose is to ensure that a defendant "can make his motion to suppress prior to trial" by "request[ing] the government to give notice of its intention to use specified evidence

which the defendant is entitled to discover under rule 16." Fed. R. Crim. P. 12 advisory committee's note to 1974 amendment. The Rule "was not designed to aid the defendant in ascertaining the government's trial strategy, but only in effectively bringing suppression motions before trial, as required by Rule 12(b)(3)." *United States v. De La Cruz-Paulino*, 61 F.3d 986, 994 (1st Cir. 1995); *accord U.S. v. Lujan*, 530 F. Supp. 2d 1224, 1246 (D.N.M. 2008) (stating that the Rule's purpose is "not to reveal the government's trial strategy"). Put differently, defendants cannot invoke Rule 12(b)(4)(B) "to force the government to decide precisely which documents provided in discovery it will offer at trial and to prevent it from using any that it does not so designate as a matter of trial tactics." *United States v. El–Silimy*, 228 F.R.D. 52, 57 (D. Me. 2005). "Any request under Rule 12(b)(4)(B) must identify evidence with sufficient specificity that the government can readily ascertain the particular evidence referenced," as "[o]nly then can the government effectively provide notice whether it intends to offer that particular evidence in its case-in-chief." *United States v. Ishak*, 277 F.R.D. 156, 160 (E.D. Va. 2011).

Defendant Brown specifically requests: (1) statements or "admissions by conduct" made by the defendant, including during any polygraph; (2) items, objects, or information received as the product of a search executed by government agents; (3) recordings made pursuant to wiretaps; (4) recordings made pursuant to consensual recordings; (5) pre-trial identification procedures, including line-ups; (6) any evidence arguably obtained in violation of federal, state, or local law; (7) grand jury testimony that the government has reason to suspect was perjured; and (8) any other information or material which might come under this rubric. ECF No. 108 at 1–2. The Government states that it has provided the first two categories of information, that categories three through five are not at issue in this case, that categories six and seven fall within

its *Brady* and *Giglio* obligations, and that the eighth request is insufficiently specific, *see Ishak*, 277 F.R.D. at 160. ECF No. 118 at 25–26. To the extent that Defendants request evidence falling within the Government's *Brady* and *Giglio* obligations, and to the extent the Government discovers additional evidence falling within the first and second categories, the Court expects that the Government will comply with its already well-established disclosure obligations. The Court otherwise agrees that the third, fourth, and fifth categories are not relevant in this case, and that the eighth category is insufficiently particular. Thus, this motion will be deemed moot.

Finally, Defendant Brown moves to require the Government to review the personnel and internal affairs files for all testifying witnesses and those who had substantial contact with them in order to review their prior conduct and testimony and identify potential evidence of perjurious conduct or other like dishonesty. ECF No. 111 at 9–10. Defendant relies primarily on *United States v. Henthorn*, 931 F.2d 29 (9th Cir. 1991), but *Henthorn* has been rejected by other circuits, *see United States v. Wilson*, 278 F.R.D. 145, 156 (D. Md. 2011), and curtailed even in the Ninth Circuit, *see United States v. Jennings*, 960 F.2d 1488, 1491 (9th Cir. 1992); *United States v. Dominguez–Villa*, 954 F.2d 562, 565 (9th Cir. 1992). Thus, the Court denies Defendant's motion to the extent it goes beyond the Government's obligations under *Brady* and *Giglio.*

### C.  Motions to Suppress

#### i.  Warrantless Searches

Defendants challenge the searches conducted by law enforcement made upon their detention and arrest. "As a general rule, the Fourth Amendment requires that law enforcement searches be accompanied by a warrant based on probable cause." *United States v. Kolsuz*, 890 F.3d 133, 137 (4th Cir. 2018). "Although the concept of probable cause defies a precise definition, it exists where the known facts and circumstances are sufficient to warrant a man of

10

reasonable prudence in the belief that contraband or evidence of a crime will be found in the place to be searched." *United States v. Richardson*, 607 F.3d 357, 369 (4th Cir. 2010) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)) (internal quotation marks omitted).

In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement. *See Kentucky v. King*, 563 U.S. 452, 461 (2011). One such exception is a search incident to a lawful arrest. *Riley v. California*, 573 U.S. 373, 382 (2014). When conducting a search incident to arrest, an officer may search "the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." *Chimel v. California*, 395 U.S. 752, 763 (1969); *see also United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973) ("When officers have probable cause to arrest, they may conduct a full-body search, including pockets and clothing."). Ultimately, "[t]he [g]overnment bears the burden of proving, by a preponderance [of the evidence], the legality of the search and seizure which it intends to introduce at trial." *United States v. Davis*, 657 F.Supp.2d 630, 636 (D. Md. 2009) *aff'd*, 690 F.3d 226 (4th Cir. 2012).

To state the obvious, a search incident to arrest is only justified if the underlying arrest is lawful. Defendants all claim their arrests were not. "It is well-settled under Fourth Amendment jurisprudence that a police officer may lawfully arrest an individual in a public place without a warrant if the officer has probable cause to believe that the individual has committed, is committing, or is about to commit a crime." *United States v. Dickey-Bey*, 393 F.3d 449, 453 (4th Cir. 2004). "[P]robable cause to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed . . . an offense." *Cahaly*

11

*v. Larosa*, 796 F.3d 399, 407 (4th Cir. 2015) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)) (internal quotation marks omitted).  "While probable cause requires more than 'bare suspicion,' it requires less than that evidence necessary to convict." *United States v. Gray*, 137 F.3d 765, 769 (4th Cir. 1998).

If probable cause does not exist, law enforcement may, under certain circumstances, perform what is commonly referred to as a "*Terry* stop." *See United States v. Curry*, 965 F.3d 313, 319 (4th Cir. 2020), as amended (July 15, 2020), as amended (July 16, 2020) (discussing *Terry v. Ohio*, 392 U.S. 1 (1968)). "If police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion." *United States v. Hensley*, 469 U.S. 221, 229 (1985). Officers must have had "a 'particularized and objective basis for suspecting legal wrongdoing.'" *United States v. Bernard*, 927 F.3d 799, 805 (4th Cir. 2019). Courts assess whether an officer has articulated reasonable suspicion for a stop under the totality of the circumstances, giving "due weight to common sense judgments reached by officers in light of their experience and training." *United States v. Perkins*, 363 F.3d 317, 321 (4th Cir. 2004). "Judicial review of the evidence offered to demonstrate reasonable suspicion must be commonsensical, focused on the evidence as a whole, and cognizant of both context and the particular experience of officers charged with the ongoing tasks of law enforcement." *United States v. Branch*, 537 F.3d 328, 337 (4th Cir. 2008). During a *Terry* stop, the officer may conduct a protective "frisk," a pat-down of the person's outer clothing for weapons, so long as "the officer reasonably believes that the person is 'armed and dangerous.'" *United States v. Robinson*, 846 F.3d 694, 700 (4th Cir. 2017) (quoting *Terry*, 392 U.S. at 27).

Defendants argue in their Motions to Suppress that evidence seized during (and after) Defendants' arrests must be suppressed because the arrests themselves were illegal. To conduct this analysis, the Court must determine when the Defendant was seized for Fourth Amendment purposes and when such seizures progressed from *Terry* stops to arrests. A seizure requires, as does an arrest, "*either* physical force . . . *or*, where that is absent, *submission* to the assertion of authority." *California v. Hodari D.*, 499 U.S. 621, 626 (1991) (emphasis in original). The Fourth Circuit has examined whether a defendant was seized when, as here, police officers parked their vehicle behind a defendant's car in order to block it in, *United States v. Stover*, 808 F.3d 991, 993 (4th Cir. 2015), and concluded that the officers' actions constituted a "show of authority," *id.* at 997; *see also United States v. Jones*, 678 F.3d 293, 296–97 (4th Cir. 2012). However, the defendant was not seized when he exited the car and did not comply with police orders to get back in it because he had not submitted to their authority. *Stover*, 808 F.3d at 1000. Defendant Brown asserts that he was seized when Officer Harding pulled his vehicle into the driveway at 3805 Blenheim Road, blocking Defendant Brown in the driveway and that the seizure was unlawful because reasonable suspicion had not yet formed. ECF No. 135 at 124. However, as in *Stover*, Defendant Brown did not comply with police orders when he was blocked in, as he attempted to run away. Therefore, he was not seized until he was subsequently apprehended and cuffed. [3]

---

[3] The use of handcuffs does not immediately convert the detainment of Defendant Brown into an arrest. "Brief, even if complete, deprivations of a suspect's liberty do not convert a stop and frisk into an arrest so long as the methods of restraint used are reasonable to the circumstances." *United States v. Crittendon*, 883 F.2d 326, 329 (4th Cir. 1989). Handcuffing a suspect can thus be found "'reasonably necessary to maintain the status quo and protect [officer] safety during an investigative stop.'" *Id.* (quoting *United States v. Taylor*, 857 F.2d 210, 213 (4th Cir. 1988)); *see also United States v. Elston*, 479 F.3d 314, 320 (4th Cir. 2007) ("Our decisions have recognized that 'drawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest.'"). Officer Harding had been informed that suspects may be armed, and thus handcuffing was reasonable and did not elevate the detainment to an arrest. *See Elston*, 479 F.3d at 320 ("These officers reasonably suspected that Elston was armed and dangerous, and thus did not exceed the limits of a *Terry* stop by drawing their weapons and placing Elston in handcuffs.").

Having determined that Defendant Brown was seized when cuffed, the Court turns to whether the seizure was legal given the officers' knowledge at the time. The Government argues that Defendants were first detained under *Terry*, and that the *Terry* stops then graduated into arrests based on probable cause, and Defendants were searched accordingly. ECF No. 135 at 144–45; *see also* ECF No. 118 at 11.

At the time Defendant Brown was cuffed, Officer Harding knew he was driving a Ford Explorer fitting the description of the suspects' vehicle, that he was driving near a residence that had just been burglarized, that he was driving around that neighborhood—which was similar in nature to others burglarized—and pulling into different driveways repeatedly, that he was wearing dark clothing similar to the description of the suspects' clothing, that he had driven away quickly when he appeared to recognize that Officer Harding was a police officer, and that he had run away again when Officer Harding parked behind him in the driveway at 3805 Blenheim Road, identified himself as a police officer, and ordered Defendant Brown to the ground. The Court finds Officer Harding had at least reasonable suspicion to detain Defendant Brown for further investigation. In the process of detaining Defendant Brown, Officer Harding saw a cell phone and a walkie-talkie two-way radio in his hands, consistent with knowledge he had that two-way radios had been used in the burglaries and indicative of the fact that he was in active communication with other individuals nearby. ECF No. 135 at 29. The walkie-talkie, in addition to the other evidence, was sufficient to establish probable cause. Officer Harding then conducted a search of Defendant Brown's pockets and found several different IDs and a hotel key card. *Id.* at 31–32. After that search, Officer Harding was also able to see a safe in the back seat of the vehicle driven by Defendant Brown. *Id.* at 30. A safe had just been stolen from 14101

Blenheim Road.[4] *Id.* at 11. Defendant Brown was then formally arrested around 7:00 p.m., January 26, 2018. *Id.* at 89.

That the search of Defendant Brown's person took place prior to the formal arrest is not disqualifying. *See United States v. Diaz*, 854 F.3d 197, 205 (2d Cir. 2017) ("It makes no difference whether the search occurs before or after the arrest so long as it is 'substantially contemporaneous with the arrest and is confined to the immediate vicinity of the arrest.'") (quoting *Shipley v. California*, 395 U.S. 818, 819 (1969)) (internal citations omitted). The important inquiry is not whether Defendant had been formally arrested at the time of the search, but instead whether officers had probable cause to arrest him at the time of the search. *See United States v. Sanchez*, 555 F.3d 910, 921 (10th Cir. 2009) ("To be sure, it appears that there can be no search incident to arrest unless the suspect is at some point formally placed under arrest. . . . But the arrest itself, for constitutional purposes, may be said to have occurred well before that formality."). Here, the Court finds there was probable cause to arrest Defendant Brown once the officers found him in possession of the two-way radio, in light of the other information they had, and that his arrest and the accompanying search were therefore lawful.

At the time Defendant Fields was detained, officers knew Defendant Brown had been arrested and had a safe in his vehicle believed to have been taken as part of a burglary, that one of the driveways into which he had pulled had also been burglarized (3 Blenmont Court), that based on Defendant Brown's possession of the two-way radio and the way he was circling the neighborhood he had likely been working with others who were on foot nearby, and that the

---

[4] Using a flashlight to look into a vehicle does not constitute a search protectable by the Fourth Amendment. *See Texas v. Brown*, 460 U.S. 730, 739–40 (1983) ("It is likewise beyond dispute that Maples' action in shining his flashlight to illuminate the interior of Brown's car trenched upon no right secured to the latter by the Fourth Amendment."); *see also Petteway v. United States*, 261 F.2d 53, 54 (4th Cir. 1958) ("It is well established that it is not a search to observe what is open and patent either in daylight or in artificial light.").

suspects were likely wearing dark clothing. Around 10:00 p.m., the officers saw Defendant

Fields emerge in dark clothing from the wood line next to a playground and a church parking lot,

a location where officers expected to find potential suspects, having seen individuals running

into the woods in that direction. ECF No. 135 at 35, 76–77. Foot traffic was uncommon in that

area, particularly at that hour. *Id.* at 37–38. The parking lot was also a walkable distance from the

two burglaries that had occurred that night. *Id.* at 37. Defendant Fields told the officers

unprompted that he was in that area in order to meet a prostitute, which would have been unusual

given that he was in a church parking lot in an area officers stated did not receive a lot of calls

for service. *Id.* at 38, 77. At roughly the same time in the same area, officers had also found

Defendant Beckles, who was wearing combat boots, consistent with what suspects had been seen

wearing in surveillance videos. *Id*. at 40. The Court thus finds Defendant Fields' detention was

supported by probable cause. Defendant Fields was then taken to a patrol car and admitted to

having money with him. *Id.* at 79. Defendant Fields was placed under arrest and searched. *Id.* at

79–80. The Court finds that based on the information available to officers at the time of

Defendant Fields' arrest, the officers had probable cause to arrest him, and thus the search of his

person was permissible. In that search, officers found over $1,000 hidden in a sock as well as a

hotel room key matching that found in Defendant Brown's possession. *Id.* at 79–80.

Finally, at the time Defendant Beckles was detained, the officers not only had the

information listed above with respect to Detective Fields, but also knew that Defendant Beckles,

as mentioned above, was wearing combat boots, which Officer Harding found noteworthy given

that one of the suspects appeared to be wearing combat boots in surveillance footage. ECF No.

135 at 40. Therefore, the Court also finds Defendant Beckles' initial detention was supported by probable cause.[5]

Because the detentions and arrests of all three Defendants were valid, the Court denies Defendants' motions to suppress the evidence seized in the searches pursuant to those stops and arrests. The Court further finds that the tangible and derivative evidence seized in connection with the execution of search and seizure warrants will not be suppressed as fruit of the poisonous tree of illegal arrests.

### ii.   Searches Pursuant to Warrants

Defendant Beckles and Fields further argue that the searches pursuant to warrants must be suppressed because they were not supported by sufficient probable cause, failed to particularly describe the places to be searched and the items to be seized, and the searches exceeded the scope authorized in the warrants. *See* ECF No. 92 at 2; ECF No. 77 at 2. In determining whether the issuance of a search warrant is appropriate, "[a] probable cause assessment requires the issuing judge to decide whether, given the totality of the circumstances, there is a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Richardson*, 607 F.3d 357, 369 (4th Cir. 2010) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). A magistrate judge's determination of probable cause "is entitled to great deference," and this Court's role "is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." *United States v. Drummond*, 925 F.3d 681, 687 (4th Cir. 2019) (quoting *Richardson*, 607 F.3d at 369) (internal quotations omitted).

---

[5] Defendant Beckles was found lying on the ground, although it is not clear whether this was in response to the officers' order to Defendant Fields or whether he was attempting to hide from the officers.

Investigators secured search and seizure warrants for: the Ford Explorer that Defendant Brown was driving the night he was arrested, ECF No. 120-4; the hotel rooms for which all three Defendants had key cards, ECF Nos. 120-5, 120-6; DNA samples, ECF Nos. 120-7, 120-8, 120-9; seized devices, ECF No. 120-10; two North Carolina residences, ECF Nos. 120-11, 120-12; three Google accounts and sixteen social media, email, and other electronic accounts, ECF Nos. 120-13, 120-14, 120-15, 120-16; and historical cell site data, [6] ECF Nos. 120-17, 120-18, 120-19, 120-20, 120-21, 120-22, 120-23, 120-24, 120-25, 120-26, 120-27.

Defendants do not appear to seriously contest the validity of the warrants or their execution, as the motions do not contain specific assertions, and Defendants did not address the issues at the hearing. Indeed, the Court finds no evidence suggesting the warrants were invalid, as they contained sufficiently particular descriptions of the places to be searched and items to be seized and were supported by detailed affidavits showing probable cause. For example, hotel key cards were found on all three Defendants, and investigators determined they belonged to the Days Inn Towson. ECF No. 120-5 at 16; *see also* ECF No. 135 at 92–93. The hotel manager informed investigators that room numbers 107 and 108 were rented to Defendant Beckles, and hotel video surveillance footage showed a dark green Ford Explorer entering the premises that appeared to be the same one that Defendant Brown was driving on January 26, 2020. ECF No. 120-5 at 16; *see also* ECF No. 135 at 92–93. Due to investigators' experience, they expected Defendants to store the stolen property at the hotel. ECF No. 120-5 at 16. Thus, the warrant to search the hotel rooms was supported by probable cause. As stated above, a magistrate judge's

---

[6] The cell-site data was not obtained by warrant but was issued pursuant to 18 U.S.C. § 2703(d), after a court made a finding of probable cause. After the order was issued, the Supreme Court held that a search warrant was required for this information. *Carpenter v. United States*, 138 S.Ct. 2206, 2221 (2018). However, the cell-site data will still be admissible because it was obtained based on good-faith reliance on then controlling law. *United States v. Chavez*, 894 F.3d 593, 608 (4th Cir. 2018) ("Objectively reasonable good faith includes 'searches conducted in reasonable reliance on subsequently invalidated statutes.'") (quoting *Davis v. United States*, 564 U.S. 229, 239 (2011)).

determination of probable cause "is entitled to great deference." *Drummond*, 925 F.3d at 687. The Court finds no grounds to conclude the magistrate lacked "a substantial basis for concluding that probable cause existed" for the warrants in this case. *Id.* The Court also finds no evidence suggesting the searches exceeded the scope of the warrants. Therefore, the Court denies Defendant's motions to suppress evidence obtained in the course of the searches conducted pursuant to warrants, finding the warrants and their executions lawful and finding that they proceeded from legal arrests.

### iii.   Custodial statements

Defendants move to suppress statements obtained in violation of their privilege against self-incrimination and their right to counsel. ECF No. 76, 91, 109. The Fifth Amendment privilege against self-incrimination provides that "[n]o person... shall be compelled in any criminal case to be a witness against himself." U.S. Const., Amendment V. In *Miranda v. Arizona*, the Supreme Court established a prophylactic, procedural mechanism that safeguards a defendant's Fifth Amendment privilege when that defendant is subject to custodial interrogation. 384 U.S. 436, 498 (1966); *see also Dickerson v. United States*, 530 U.S. 428, 444 (2000) (reaffirming *Miranda* as "a constitutional rule"). Before conducting a custodial interrogation of a suspect, law enforcement officials must inform the suspect that he has the right to remain silent, that his statements may be used against him at trial, and that he has the right to an attorney during questioning. 384 U.S. at 444. The Government bears the burden of establishing, by a preponderance of the evidence, that Defendant was advised of his rights. *See Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

"A confession made during a custodial interrogation will be suppressed unless police advise the defendant of his rights under *Miranda*, and the defendant knowingly, intelligently, and

voluntarily waives those rights." *United States v. Holme*s, 670 F.3d 586, 591 (4th Cir. 2012) (internal citations omitted). Whether Defendant's waiver was knowing, intelligent, and voluntary "has two distinct dimensions." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). It must have been voluntary in that it was "a free and deliberate choice rather than intimidation, coercion, or deception," and it must have been intelligent and knowing in that it was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.*

The determination of whether the waiver was made free of coercion and with the "requisite level of comprehension" is made based on the totality of the circumstances. *Id.* "Intoxication and fatigue do not automatically render a confession involuntary." *United States v. Casal*, 915 F.2d 1225, 1229 (8th Cir. 1990). The crucial issue is whether "the government's agents have overborne the subject's will or have left his capacity for self-determination critically impaired." *United States v. Guay*, 108 F.3d 545, 549 (4th Cir. 1997).

Defendants each move to suppress statements made during their respective interviews at the Baltimore County Police Station after their arrests. ECF No. 76, 91, 109. First turning to Defendant Brown, after he was brought to the police station, he was provided with a *Miranda* Rights Waiver Form, a standard form the Baltimore County Police Department uses to inform individuals of their *Miranda* rights. ECF No. 135 at 94. The top of the form has blank spaces for the individual's name, age, address, phone numbers, education level, and literacy. ECF No. 120-1. Before ultimately invoking his *Miranda* rights, Defendant Brown provided the information requested, including his North Carolina address. ECF No. 135 at 94; ECF No. 120-1. The Government states that they may wish to use this information at trial, specifically the address. ECF No. 135 at 149–50. "[T]here exists an exception to *Miranda*'s coverage for routine booking

questions securing 'biographical data necessary to complete booking or pretrial services,' although this exception does not apply to questions, even during booking, that are designed to elicit incriminatory admissions." *United States v. D'Anjou*, 16 F.3d 604, 609 (4th Cir. 1994) (quoting *Pennsylvania v. Muniz*, 496 U.S. 582, 601–02 (1990) (plurality opinion)). Here, based on the Court's review of the video interrogation, the investigator appeared to ask Defendant Brown for his address for the purpose of completing the form, and there is no indication he did so to elicit an incriminatory admission. Therefore, the statement is admissible.

Unlike Defendant Brown, both Defendants Fields and Beckles waived their *Miranda* rights before making statements to the police during their interviews. ECF No. 135 at 97–98, 100–10. However, they contest the admissibility of the statements on the grounds that they were fruits of the poisonous tree of their illegal arrests. *Id.* at 137. Defendants additionally each raise mild concerns about the voluntary nature of the waivers based on indications in the video that both Defendants Fields and Beckles were sleep-deprived at the time and, according to Defendants, unable to knowingly and intelligently waive their rights. *Id.* at 132–33, 137. Because the Court has already determined that the arrests were lawful, the Court addresses only the second argument.

Defendant Fields was interviewed immediately after Defendant Brown. When the officers walked into the interview room, Defendant Fields appeared to be asleep on the floor. The officers woke him up, and one asked him if he needed anything. Defendant Fields got off the floor and sat in a chair, but continued to lean his head against the wall, and the officer stated, "You look like you're sleeping still." Defendant Fields finally sat up and said, "I'm up, I'm up." The officer began asking him questions listed on the *Miranda* Rights Waiver Form, including his name, age, and address, and Defendant Fields was responsive, although seemingly still groggy.

The officer then proceeded to review each of Defendant Fields' *Miranda* rights with him and asked him to initial beside each one to indicate he understood it, and Defendant Fields did so. He paused before signing the waiver, but ultimately chose to sign it and then answered questions. The officers next interviewed Defendant Beckles. At the start of Defendant Beckles' interview, the officer removed his handcuffs so that he could stand and stretch. They made small talk. The officer again reviewed the *Miranda* rights and asked Defendant Beckles to initial by each one if he understood them. Defendant Beckles did so and signed the waiver. He appeared alert during the interview and provided a detailed story about how he was in the field to meet with a prostitute. Although Defendants Fields and Beckles may have been tired at the time they waived their *Miranda* rights, Defendant Beckles especially, viewing the videos, the Court does not find their conduct indicates they were so sleep deprived as to be unable to voluntarily and knowingly waive their rights. *See United States v. Holmes*, 670 F.3d 586, 592 (4th Cir. 2012) ("But even if Holmes was tired on the day of his interrogation, suppression is not required every time a defendant has a diminished mental state."); *United States v. Huerta*, 239 F.3d 865, 873 (7th Cir. 2001) ("[J]ust because Ms. Huerta was tired does not establish that her will was 'overborne.'"). Indeed, the officers conducted a thorough review of their rights and asked Defendants to indicate their understanding. *See* ECF No. 135 at 101–02, 108–09; *see also* ECF No. 120-2, 120-3. The officers were not coercive and invited Defendants to ask questions about anything they did not understand. Additionally, Defendants were given food and water and allowed breaks. ECF No. 135 at 107. Finding the waivers of their *Miranda* rights valid, the Court will not suppress Defendants' statements.

## III.     CONCLUSION

For the foregoing reasons, Defendants' Motion to Adopt, Motions for Disclosure of Rule 404(b) Evidence, and Motion for Disclosure of Experts are granted. Defendants' Motion to Sever, Motions for Leave to File Additional Motions, Motion for Disclosure of Co-Defendants' Statements, and Motion to Require Prosecution to Review and Confirm Witness are denied. Defendants' Motion for Disclosure Pursuant to Rule 12 is deemed moot. Defendants' Motions to Suppress Evidence and Motions to Suppress Statements are denied. A separate Order shall issue.

Date: <u>November 2 , 2020</u>                                              /s/

GEORGE J. HAZEL
United States District Judge